(123 App. Div. 128.)

### SHEPARD v. MORGAN.

(Supreme Court, Appellate Division, Fourth Department. January 8, 1908.)

1. CORPORATIONS—OFFICERS—FRAUD—EVIDENCE—INSTRUCTIONS.

An officer of a corporation, with authority to borrow money on its
behalf, gave its accommodation notes to a third person under an agree-
ment that they would be returned before maturity. The notes were
transferred to bona fide purchasers before maturity after the officer
had informed the purchasers that the notes were valid debts of the
corporation. He kept the transactions from the other officers of the
corporation, and did not report to the corporation any list of notes. He
claimed that he acted in good faith. *Held* that, since a finding that the
officer was guilty of fraud as against the corporation was warranted, in-
structions in an action by the corporation's trustee in bankruptcy against
him for fraud that there could be no recovery unless he had an intent
to wreck the corporation were erroneous.

2. EVIDENCE—TESTIMONY OF PARTY—UNCONTROVERTED EVIDENCE—CONCLUSIVE-
NESS.

A statement of one sued for fraud that he acted honestly and without
intent to defraud is not conclusive, and the jury may determine the
question considering the acts committed.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence, § 2438.]

3. BANKRUPTCY—DISCHARGE IN BANKRUPTCY—DEBTS DISCHARGED.

Under Bankr. Act July 1, 1898, c. 541, § 17, 30 Stat. 550 [U. S. Comp.
St. 1901, p. 3428], as amended in 1903 (Act Feb. 5, 1903, c. 487, § 5, 32
Stat. 798 [U. S. Comp. St. Supp. 1907, p. 1026]), providing that a discharge
in bankruptcy shall release a bankrupt from his debts except such as are
liabilities for obtaining property by false pretenses or were created by
fraud while acting as an officer or in any fiduciary capacity, a judgment
against an officer of a corporation authorized to pledge its credit for loans,
based on his fraud in executing in the name of the corporation accommo-
dation notes which became valid obligations in the hands of innocent
purchasers, is not discharged by his discharge in bankruptcy.

Kruse, J., dissenting.

Appeal from Trial Term, Jefferson County.

Action by William J. Shepard, trustee in bankruptcy of the Hopper-Morgan Company, against Roger Morgan. From a judgment for defendant, and from an order denying a new trial, plaintiff appeals. Reversed, and new trial ordered.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

George S. McCartin and Henry Purcell, for appellant.

E. C. Emerson, for respondent.

SPRING, J. The Hopper-Morgan Company was a domestic corporation located in Glen Park, in the county of Jefferson, engaged in the business of manufacturing pads and tablets for use in schools. It had a capital stock of $150,000, and did an extensive business. It was organized in November, 1898, and commenced business in April following. There was a branch plant at Benton Harbor, Mich., which was sold at considerable loss in April, 1903. The stock had been owned by Elisha Morgan, his son the defendant, and Bertrand Hopper, who had charge of the plant in Michigan and $100 treasury stock. After the sale of this plant Hopper, who had owned stock to the amount of $19,900 par value, turned into the company all his stock, except $5,000. Morgan, Sr., died about that time, and the stock was then owned as follows: $71,000 by his estate; $59,000 by the defendant; $5,000 by Hopper; $100 by Bridge, who was secretary and in active personal charge; and the balance was held by the company. The manufactured goods were sold on credit, and no money was received for them until September, when the school year commenced. A large amount of money was required in carrying on the business, and the corporation was a heavy borrower. During the year 1905 the business was increasing, but the company was short of funds. It had borrowed of banks in Watertown until the limit was reached, and the defendant, who attended to the borrowing of money, was making desperate efforts to secure what was needed, and did borrow $20,000 of one Todd, putting up his own certificates of stock in the company as collateral security. He also arranged with a loaning brokerage firm in New York to accept accounts at the ruinous deduction of 25 per cent. from the face value, and had obtained something like $25,000 in this way. The Hopper-Morgan Company, although in tight stress for cash, was reputed to be worth $100,000 and was of good credit. The defendant had an office in New York, and in March, 1905, he met a man named Trautwine, who induced him to deliver promissory notes of the company to the amount of $50,000, which Trautwine, or the company which he represented, was to use as collateral security for its own obligations; and Trautwine agreed that these notes would be returned to the defendant a few days before they severally matured. In consideration of this agreement, Trautwine promised to pay to the defendant $1,500, which he did in a short time. When the arrangement was made, Trautwine purported to represent the Emerson Shoe Company of Boston, Mass., but later, as the extraordinary plan was embodied in a written statement, it was signed, "Emerson Mfg. Co., George A. Smith, General Manager." This statement provided:

"Said notes are given us for accommodation, and we hereby agree to return said notes to the Hopper-Morgan Co. at least five days before maturity, in the same condition as when delivered, without cost of any kind whatsoever to the Hopper-Morgan Company."

The defendant did not desire these notes put in circulation in certain localities where the company was transacting business, so at his suggestion the following postscript was added to the statement:

"These notes are not to be used in the following cities or towns: Watertown, N. Y., all of western Massachusetts, including Worcester, neither Hartford, Conn."

In addition to this plan Trautwine agreed to discount in a short time paper of the Hopper-Morgan Company to the extent of $10,000 for its benefit, and a note for that sum was also intrusted to him, on which nothing was ever received by the company. A week later another similar arrangement was made by the defendant with Trautwine, and another list of notes to the amount of $50,000 was delivered over, and eventually the defendant received the 3 per cent., or $1,500, and the notes were put in circulation by Trautwine or his confederates. Later the defendant fell in with a man named Morton, who claimed to be president of the mythical Emerson Manufacturing Company, and gave to him a note for $10,000 for discount, and some of the notes already issued were returned and others of different amounts were substituted for them. Morton went to Philadelphia with the defendant, and introduced him to a promoter named Helms, who was exploiting a Mexican mining company, and to whom he delivered $50,000 of the notes of the Hopper-Morgan Company; Helms agreeing to pay him $5,000 for the privilege of using these notes, and to return them to the defendant before maturity. He also met Anderson or Whelpley, for his identity and name are uncertain, and Brazeir, who were apparently in league with Morton and Trautwine in abetting the scheme, and also interested in the fictitious Emerson Company, and additional paper was delivered over to these men under a like plan. These notes issued to the Emerson Company were rapidly put in circulation in the New England states. Many of the proposed purchasers, in the main banks, communicated with the defendant, inquiring as to the genuineness of the note tendered in each instance; and the defendant, still under the spell of Morton, apprised these purchasers that the notes were genuine, and would be paid at maturity. The Hopper-Morgan Company, already burdened with an overload of debts, was unable to weather the storm of this influx of notes, and in September was in the control of a receiver. These notes, to the amount of $56,730, were allowed by the referee in bankruptcy as valid claims against the manufacturing corporation; and many others were rejected by him, and actions are pending to test the good faith of the holders of these obligations.

Morgan was in middle life, well educated, a man of affairs, and understood the effect of allowing these notes to get in the possession of bona fide holders. He was authorized to borrow money on behalf of the company. His brother, who was in business in Springfield, Mass., was its president, but gave no attention to its affairs. Bridge,

the secretary, was looking after the business in Watertown and Glen Park. The defendant really was in absolute control of its financial affairs. He did not consult either his brother or Bridge in regard to the foolhardy efforts he was making to secure a mere pittance of money to tide over an emergency. He did not report to the company any list of these notes. Its books contained no record of them. None of the directors knew they were issued until the crash came. Traut-wine, Morton, Helms, and their co-conspirators were total strangers to the defendant. He made no attempt to learn of their financial standing or their reputation for business integrity. The negotiations, in their various stages, continued for several months. Failure to perform was frequent. New schemes were devised and palmed off on this credulous defendant, each requiring the issue or substitution of notes, and all the time he was flooded with letters and telegrams from banks and others seeking to gather information concerning the notes. He was vouching for their genuineness. He was obtaining no money from these plotters; still he continued pliable to their schemes. The complaint sets out in a general way the facts I have delineated, and which are undisputed; and charges that the acts alleged "were secretly and furtively done" by the defendant and without the knowledge of the company or its creditors, and he "carefully concealed" from them "all such wrongful and unlawful acts, and committed the same knowingly and fraudulently, and with the intent to defraud and injure the parties aforesaid against the interests and rights of the said Hopper-Morgan Company or other members of said company and the creditors of the said company." The court, in his charge to the jury, after stating that the action was one in fraud, said:

"I am not aware in this case that any evidence has been offered which can lead you to the question of what could have been his motive to do this if he was interested and had the design to wreck this company; but nevertheless there may be in this case some testimony, some acts upon his part, that you may find was the motive for doing it. I cannot recall all of the facts that have been given to you, or all of the correspondence, or all of the facts, but I cannot now point to any single piece of testimony from which you could find alone that he had a motive and an intent in this case and a design to wreck the company, of which he was a part, or to injure and defraud the creditors of it; but the evidence is all before you, the testimony rather, and it is for you to say and for you to point out and find it if it is in the case, and if it is not in this case, and if you cannot find in this case, upon your oaths as men, that this defendant had a wicked motive and an intent and design to wreck this corporation and to defraud and injure the creditors thereof, it would be your duty to find a verdict for him."

And again:

"As I said before, in the eye of the law fraud is odious. It is a fearful charge, and it cannot be presumed; but, if you believe that this intent, this motive upon the part of this defendant, was a wicked motive, an intent and design to wreck this company and to injure its creditors and damage its creditors, then it would be your right and your duty to find a verdict for the plaintiff. Of course, in cases of this kind it takes the defendant's body, but that should not deter you from finding a verdict against the defendant if you believe the truth and the facts are with the plaintiff."

Proper exceptions were taken to these statements to the jury. The gist of the instructions from beginning to end, reiterated over and over with much vigor, was that an intent "to wreck the company"

must be found by the jury in order to warrant a verdict for the plaintiff. The gravamen of the action is fraud. The charge is that the defendant signed the name of the corporation he represented to promissory notes and permitted them to be circulated as accommodation paper, knowing that they were to be acquired by innocent purchasers. As might reasonably be expected, these notes became valid obligations against the company. It is no answer to unlawful transactions of this kind that the defendant expected Trautwine and his abettors to return these notes canceled before maturity. The fraud was in the inception of the notes. He knew if these notes, or any considerable part of them, became debts of the company, its ruin was certain. When confronted with the wrecking and disaster, which are the reasonable sequence of his unlawful acts, he cannot evade the charge of fraud by claiming that he did not intend to ruin the corporation. He did intend to deliver over the notes as genuine obligations of the company. When he notified the banks that they would be paid at maturity, he knew that they were without adequate consideration. He kept these transactions from the other officers of the company. They were never listed among its debts. The jury might have found an intent to defraud, to deceive the company and its creditors, by this furtive conduct on his part. No matter about an intent to wreck the company. That may have been the resulting damage, an incident to the chief fraudulent act in sending out these accommodation notes as if they were valid obligations of the company. He falsely asserted a material fact, to wit, that the notes were the genuine obligations which they purported to be. The trial court in submitting the case to the jury should not have made the wicked motive to wreck the company a test of the defendant's culpability. That was too narrow an issue. If the jury found he signed these notes and delivered them over to Trautwine or his confederates, expecting they would be transferred as obligations of the company, they might find in the circumstances contained in the record an intent to defraud the company and its creditors. His statement that he acted honestly and without intent to defraud is not conclusive. The best guide in ascertaining a man's purpose is the acts which he has committed. From them the jury may determine the motives of the defendant. Acts when illegal or flagrantly culpable carry their own condemnation.

Again, the court disregarded the fraudulent inception of the execution and delivery of the notes, which is an important circumstance in the case. The defendant destroyed the credit of the corporation by issuing its notes far beyond its ability to pay. He may have been sufficiently duped to believe that the men who induced him to set afloat these notes with inadequate consideration would return them to him. He was dealing with men he did not know. He was secretly participating in transactions which would not bear the light. The consequence of the scheme, if carried out, was the ruin of the corporation, whose interests were largely intrusted to him. The stockholders and creditors were reposing in his confidence. In view of all these circumstances, the jury should have been permitted to determine whether his conduct was fraudulent, even though there was no intention to destroy the corporation.

The defendant was adjudged a bankrupt by a decree of the District Court of the United States for the Southern District of New York March 19, 1906, and it is contended that this discharge bars the claim of the plaintiff. Section 17 of the National Bankruptcy Act of July 1, 1898 (30 Stat. 550, c. 541 [U. S. Comp. St. 1901, p. 3428]), provided:

"A discharge in bankruptcy shall release the bankrupt from all his provable debts except such as * * * (2) are judgments in actions for frauds, or obtaining property by false pretences, or false representations," etc.

This provision of the act was amended February 1, 1903 (Act Feb. 5, 1903, c. 487, § 5, 32 Stat. 798 [U. S. Comp. St. Supp. 1907, p. 1026]), by substituting in place of "judgments in actions for frauds," etc., the following:

"Liabilities for obtaining property by false pretenses or false representations."

If the claim is within the exception, there is no longer any necessity for a judgment to prevent its release by the discharge in bankruptcy. The action against the defendant is for fraud, and the facts proven, if satisfactory to the jury, constitute "obtaining property by false pretenses or false representations." The provable debts which are excepted from the discharge in subdivision 4 of section 17 of this act are those "created by his fraud, embezzlement, misappropriation, or defalcation while acting as an officer or in any fiduciary capacity." In the bankruptcy act of 1867, the offense must have been committed by a "public officer." The omission of the word "public" in the present statute is significant. The defendant was treasurer of the Hopper-Morgan Company and authorized to pledge its credit for loans, and was therefore an officer within the import of the statute, and was also acting in a fiduciary capacity. Harper v. Rankin, 141 Fed. 626, 72 C. C. A. 320.

The judgment should be reversed and a new trial ordered, with costs to the appellant to abide event.

Judgment reversed and a new trial ordered, on the law and facts, with costs to appellant to abide event. All concur, except KRUSE, J., who dissents.

KRUSE, J. (dissenting). I do not quite see how we can hold that this claim is not cut off by the discharge in bankruptcy, in view of our decision in Lewis v. Shaw (Sup.) 106 N. Y. Supp. 1012. In that case the plaintiff left with the defendant specific money for safe-keeping. The defendant used it wrongfully, and very likely committed the crime of grand larceny in so doing. We held that the defendant's liability was not one created by his fraud, embezzlement, or defalcation while acting in any fiduciary capacity, within the meaning of the bankruptcy law; nor do I think that the defendant was an officer within the meaning of that law. The decision in the case of Harper v. Rankin, 141 Fed. 626, 72 C. C. A. 320, referred to by Mr. Justice SPRING, seems to rest upon the proposition that the debt was created in a fiduciary capacity. Neither do I see how the plaintiff's cause of action can be regarded as one for obtaining money or property by false pre-

tenses or false representations. It is true that the defendant may have committed a fraud upon his company, the plaintiff, by using its paper as he did, but how can it be said that he obtained the money or property of the corporation by false or fraudulent representations? What false and fraudulent representations did he make to the corporation? As regards the charge, it seems to me the exceptions were too general to raise the question upon which it is proposed to reverse the judgment. The questions for the jury to pass upon were formulated by the trial judge to the satisfaction of both parties, and stated at the outset; and I think the questions were well understood by the jury. I vote for affirmance.